IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

KARLA NICOLE STREIT,

    PLAINTIFF,

VS.                             CV NO.: **2:20-cv-00999**

MAX CREDIT UNION,

    DEFENDANT.                  **JURY TRIAL DEMANDED**

## COMPLAINT

### I. JURISDICTION

1.    This action for injunctive relief and damages is brought pursuant to 28 U.S.C. §§ 1331, 1343(4), 2201, 2202, and 42 U.S.C. § 12101 et seq. This is a suit authorized and instituted pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. (ADA). The jurisdiction of this Court is invoked to secure protection for and to redress the deprivation of rights and Defendant's violation of the Act and for injunctive relief and damages.

2.    Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) within 180 days of the last discriminatory act (Exhibit A). Plaintiff further filed this lawsuit within ninety (90) days after receipt of the right-to-sue letter issued by the EEOC (Exhibit B).

## II.  PARTIES

3.      Plaintiff, Karla Nicole Streit, (hereinafter "Plaintiff") is currently a resident of Apollo Beach, Hillsborough County, Florida, and performed work for the Defendant in the counties composing the Middle District of Alabama during the events of this case.  Thus, pursuant to 28 U.S.C. § 1391(b), venue for this action lies in the Middle District, Northern Division.

4.      Defendant Max Credit Union (hereinafter "Defendant") is a company registered and doing business in the State of Alabama and has sufficient minimum contacts with the State of Alabama that it is subject to service of process in Alabama. Defendant is an entity subject to suit under 28 U.S.C. § 1331 and 42 U.S.C. § 12101, *et seq.*  Defendant employed at least fifteen (15) persons during the current or preceding calendar year.  Therefore, this Court has personal jurisdiction over Defendant.

## III.  STATEMENT OF FACTS

5.      Plaintiff hereby incorporates by reference each of the allegations contained in paragraphs 1 through 4 above.

6.      Plaintiff suffers from the physical impairment of Type I Diabetes and related sensory impairments caused by Type I Diabetes.

7.      Plaintiff's disability affects the major life activity related to the functioning of Plaintiff's endocrine system.

8.      Due to Plaintiff's Type I Diabetes, Plaintiff's endocrine system does not function in a manner similar to those in the general population.

9.      Plaintiff has suffered from Type I Diabetes for approximately twenty or more years.

10.     Plaintiff also suffers from depression.

11.     Defendant employs or employed Lisa Walker.

12.     Defendant employed Walker as Plaintiff's supervisor.

13.     During the course of Plaintiff's employment, Walker was aware of Plaintiff's mental health issues.

14.     Defendant employs or employed Scott Lindley.

15.     Defendant employs or employed Scott Lindley as its Chief Information Officer.

16.     Walker and Lindley conducted Plaintiff's interview regarding possible employment.

17.     Defendant hired Plaintiff on or about February 11, 2019.

18.     Prior to the commencement of her employment, Plaintiff made Defendant aware of her Type I Diabetes diagnosis.

19.     Defendant employed Plaintiff as System Analyst II.

20.     Defendant paid Plaintiff a salary.

21.     Plaintiff enrolled in Defendant's Health Insurance benefits plan.

22.     Upon information and belief, Defendant's Health Insurance is a "self-insured" program.

23.     During Plaintiff's employment, physicians in Birmingham, Alabama treated Plaintiff's Type I Diabetes.

24.     Due to her healthcare needs, Plaintiff and her husband selected a residence in Montevallo, Alabama, which is roughly equal distance between Defendant's business location in Montgomery, Alabama and the medical providers located in Birmingham, Alabama.

25.     Upon hiring, Plaintiff disclosed her Type I Diabetes to Defendant, including Walker, and requested the reasonable accommodation to work from home on the days she needed to travel to Birmingham to see her physicians.

26.     Until July 2019, Plaintiff worked from home without issue.

27.     During July 2019, Plaintiff suffered a diabetic episode that required out-patient surgery.

28.     The diabetic episode commenced on or about July 17, 2019 and resulted in diabetic retinopathy that damaged the blood vessel in Plaintiff's eye and caused a temporary blindness that required surgery.

29.     On July 19, 2019, Plaintiff notified Defendant's Human Resources Department regarding the need for surgery.

30.     Defendant employs or employed Erin Mayben.

31.     Defendant employs or employed Mayben as its HR Generalist.

32.     Mayben stated no additional paperwork was needed for the absences related to the surgery.

33.     Plaintiff underwent surgery on July 25, 2019.

34.     On August 5, 2019, Plaintiff's healthcare providers released Plaintiff to return to work.

35.     Plaintiff informed Walker of her healthcare needs and about her surgery.

36.     Upon Plaintiff's return from surgery, Walker began an increased scrutiny of Plaintiff's job performance.

37.     Defendant employs or employed Tara McDowell.

38.     Defendant employs or employed McDowell in its Human Resources Department.

39.     On September 10, 2019, Plaintiff met with Tara McDowell.

40.     During that meeting, McDowell commented about Plaintiff's absences and she stated, "I didn't know if there was a health concern we should know about."

41.     Plaintiff informed McDowell that she was a Type I Diabetic.

42.     Plaintiff explained to McDowell about her above-mentioned surgery.

43.     Plaintiff also explained that she worked from home on days she had doctors' appointments in Birmingham.

44.     Plaintiff informed McDowell that following her surgery, Walker did not want Plaintiff working from home.

45.     Plaintiff also informed McDowell that Walker "reminded" Plaintiff that after so many unscheduled sick days, Defendant would terminate Plaintiff's employment and "there's nothing [Plaintiff] can do."

46.     Defendant's attendance policy states that "8 or more unscheduled absences within a 12-month period 'will result in termination.'"

47.     McDowell informed Plaintiff that if there is a doctor's note, then the absence is not considered "unscheduled."

48.     Defendant's attendance policy provides that "when an associate is out to care for a sick family member who is taken to the doctor as long as a doctor's note is provided upon return."

49.     Defendant's attendance policy provides that "consecutive days of absence for the same problem will count as one occurrence."

50.     Defendant does not have a written sick day policy for salaried employees.

51.     Defendant does not provide Plaintiff with a "bank" of sick days that she could manage or ration.

52.     Plaintiff had accrued a total of 6 "unscheduled absences."

53.    Defendant's attendance policy provides that "Supervisors will consult with associates regarding any unscheduled absence immediately after the associate's return to work."

54.    Defendant's attendance policy provides that "After four unscheduled absences, within a 12-month period, . . . the Human Resources Department will notify the associate's supervisor. A formal notice and statement of future disciplinary action, resulting from poor attendance, will be given to the associate for signature and retention in the associate's personnel file."

55.    Defendant did not provide Plaintiff with a formal notice and statement of future disciplinary action for signature and retention in the Plaintiff's personnel file after it determined that Plaintiff had four unscheduled absences.

56.    Defendant's attendance policy provides that "After six unscheduled absences, in a 12-month period, a notice will be provided for signature and retention in the personnel file.

57.    Defendant did not provide Plaintiff with a notice for signature and retention in the personnel file after it determined that Plaintiff had six unscheduled absences.

58.    Defendant's attendance policy provides that "Upon the seventh occurrence of unscheduled absence, during a 12-month period, a final notice will be made to the supervisor for review with the associate."

59.   Defendant did not provide Plaintiff with a final notice after it determined that Plaintiff had seven unscheduled absences.

60.   Defendant failed to provide Plaintiff with any formal notice for signature and retention in Plaintiff's file in violation of Defendant's progressive disciplinary policy in regard to absenteeism.

61.   Defendant failed to provide Plaintiff with a final notice for signature and retention in Plaintiff's file in violation of Defendant's progressive disciplinary policy in regards to absenteeism.

62.   On September 24, 2019, Plaintiff emailed Walker and McDowell and stated in part that "[She had] expressed feeling discriminated against, bullied, and punished due to [her] doctor appointments."

63.   On September 25, 2019, Plaintiff met with Walker and McDowell.

64.   McDowell stated that Plaintiff had abused the reasonable accommodation of working from home.

65.   Plaintiff pointed out that there was no company policy about working from home and suggested that Defendant create such a policy.

66.   Immediately after making that statement, McDowell stated "At this point, we wish to terminate your employment."

67.   McDowell then stated that Plaintiff keeping her office door shut "as of late" and "not feeling part of the team" was a problem.

68.     Walker stated that "[Plaintiff's] work performance was slipping."

69.     Plaintiff's office door was shut because she was working intensively on the "Elevate" project with a deadline to be completed on September 30, 2019.

70.     Walker acknowledged that the deadline to complete the "Elevate" project was five days away.

71.     Walker mentioned that Plaintiff had not responded to a specific email.

72.     Plaintiff did not recall ever seeing the email that Walker mentioned.

73.     Walker then mentioned a project with Q2 regarding Defendant's mortgage servicing that required a response from Beverly Shuffert prior to completing the project.

74.     Walker and McDowell provided Plaintiff with a severance agreement which Plaintiff did not sign.

75.     On September 25, 2019, Plaintiff emailed McDowell requesting a specific reason for Plaintiff's termination for which there was no response.

76.     Defendant employs or employed Kent McDurmont.

77.     Defendant employs or employed McDurmont as a System Analyst II.

78.     Walker supervises McDurmont's work.

79.     Unless it is necessary for him to work onsite, McDurmont works from home every day.

## IV.  COUNT ONE - Americans with Disabilities Act - Termination

80.     Plaintiff adopts by reference each and every material averment contained in paragraphs 1 through 79 above as if fully set forth herein.

81.     Plaintiff suffers from the physical and/or sensory impairment of Type I Diabetes.

82.     Plaintiff's Type I Diabetes affects her such that the major life activities of seeing and the functions of the endocrine system are significantly restricted as compared to the average person in the general population.

83.     Plaintiff takes insulin in order to manage her Type I Diabetes, but such medication does not prevent diabetic retinopathy, and does not prevent her from being substantially limited as compared to the average person in the general population.

84.     Plaintiff has suffered from Type I Diabetes since approximately 1999.

85.     Defendant hired Plaintiff on or about February 11, 2019.

86.     Defendant employed Plaintiff as a Systems Analyst II.

87.     Upon hiring, Plaintiff disclosed her Type I Diabetes to Defendant, including Walker, and requested the reasonable accommodation to work from home on the days she needed to travel to Birmingham to see her physicians.

88.     Until July 2019, Plaintiff worked from home without issue.

89.    During July 2019, Plaintiff suffered a diabetic episode that required out-patient surgery.

90.    The diabetic episode commenced on or about July 17, 2019 and resulted in diabetic retinopathy that damaged the blood vessel in Plaintiff's eye and caused a temporary blindness that required surgery.

91.    On July 19, 2019, Plaintiff notified Defendant's Human Resources Department regarding the need for surgery.

92.    Plaintiff was qualified for the position of Systems Analyst II with or without a reasonable accommodation of her disability.

93.    On September 10, 2019, Plaintiff met with Tara McDowell.

94.    During that meeting, McDowell commented about Plaintiff's absences and she stated, "I didn't know if there was a health concern we should know about."

95.    Plaintiff informed McDowell that she was a Type I Diabetic.

96.    Plaintiff explained to McDowell about her above-mentioned surgery.

97.    Plaintiff also explained that she worked from home on days she had doctors' appointments in Birmingham.

98.    Plaintiff informed McDowell that following her surgery, Walker did not want Plaintiff working from home.

99.   Plaintiff also informed McDowell that Walker "reminded" Plaintiff that after so many unscheduled sick days, Defendant would terminate Plaintiff's employment and "there's nothing [Plaintiff] can do."

100.   Defendant's attendance policy states that "8 or more unscheduled absences within a 12-month period 'will result in termination.'"

101.   McDowell informed Plaintiff that if there is a doctor's note, then the absence isn't considered "unscheduled."

102.   Plaintiff accrued a total of six (6) "unscheduled absences"

103.   Defendant does not have a written sick day policy for salaried employees.

104.   Defendant does not provide Plaintiff with a "bank" of sick days that she could manage or ration.

105.   On September 24, 2019, Plaintiff emailed Walker and McDowell and stated in part that "[She had] expressed feeling discriminated against, bullied, and punished due to [her] doctor appointments."

106.   On September 25, 2019, Plaintiff met with Walker and McDowell.

107.   McDowell stated that Plaintiff had abused the reasonable accommodation of working from home.

108.   Plaintiff pointed out that there was no company policy about working from home and suggested that Defendant create such a policy.

109.  Immediately after making that statement, McDowell stated "At this point, we wish to terminate your employment."

110.  Defendant terminated Plaintiff's employment on September 25, 2019.

111.  Defendant was substantially motivated by Plaintiff's disability and continuing need for healthcare in making the decision to terminate Plaintiff's employment.

112.  Defendant employed at least one other Systems Analyst II that was allowed to work from home.

113.  As a result of Defendant's violation of the ADA, Plaintiff has been damaged, suffering loss of pay, benefits, and mental anguish.

## V.  COUNT TWO – ADA – Retaliatory Termination.

114.  Plaintiff hereby incorporates by reference each of the allegations contained in paragraphs 1 through 113 above.

115.  On September 10, 2019, Plaintiff met with Tara McDowell.

116.  During that meeting, McDowell commented about Plaintiff's absences and she stated, "I didn't know if there was a health concern we should know about."

117.  Plaintiff informed McDowell that she was a Type I Diabetic.

118.  Plaintiff explained to McDowell about her above-mentioned surgery.

119.  Plaintiff also explained that she worked from home on days she had doctors' appointments in Birmingham.

120.   Plaintiff informed McDowell that following her surgery, Walker did not want Plaintiff working from home.

121.   Plaintiff also informed McDowell that Walker "reminded" Plaintiff that after so many unscheduled sick days, Defendant would terminate Plaintiff's employment and "there's nothing [Plaintiff] can do."

122.   Defendant's attendance policy states that "8 or more unscheduled absences within a 12-month period 'will result in termination.'"

123.   McDowell informed Plaintiff that if there is a doctor's note, then the absence isn't considered "unscheduled."

124.   Plaintiff accrued a total of six (6) "unscheduled absences"

125.   Defendant does not have a written sick day policy for salaried employees.

126.   Defendant does not provide Plaintiff with a "bank" of sick days that she could manage or ration.

127.   On September 24, 2019, Plaintiff emailed Walker and McDowell and stated in part that "[She had] expressed feeling discriminated against, bullied, and punished due to [her] doctor appointments."

128.   On September 25, 2019, Plaintiff met with Walker and McDowell.

129.   McDowell stated that Plaintiff had abused the reasonable accommodation of working from home.

130.   Plaintiff pointed out that there was no company policy about working from home and suggested that Defendant create such a policy.

131.   Immediately after making that statement, McDowell stated "At this point, we wish to terminate your employment."

132.   Defendant terminated Plaintiff's employment on September 25, 2019.

133.   In violation of the Americans with Disabilities Act, Defendant terminated Plaintiff's employment, in whole or in part, because of Plaintiff's disability and/or because she engaged in statutorily protected activity regarding the exercise of the reasonable accommodation related to that disability.

134.   As a result of Defendant's retaliatory termination decision, Plaintiff has been damaged, suffering loss of pay, benefits, mental anguish.

## VI. PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully prays for the following relief:

A.     Grant Plaintiff a permanent injunction enjoining the Defendant, its agents, successors, employees, attorneys and those acting in concert with the Defendant and at the Defendant's request from continuing to violate the terms of the Americans with Disabilities Act;

B.     Enter an Order requiring the Defendant to make Plaintiff whole by awarding reinstatement to the position she would have had, had she not been terminated;

C.     Award her back pay, together with employment benefits, front pay, compensatory damages; punitive damages; special damages; nominal damages;

D.     Attorneys' fees and costs;

E.     Plaintiff requests that the Court award Plaintiff equitable relief pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 12101 *et seq*. that the actions of Defendant violated the law; and,

F.     Any different or additional relief as may be determined by the Court to which Plaintiff is entitled.


Allen D. Arnold

**OF COUNSEL:**

ALLEN D. ARNOLD, Attorney at Law
A Member of The Five Points Law Group, LLC
2151 Highland Avenue South, Ste. 205
Birmingham, AL 35205
(205) 252-1550
F: (205) 502-4476
allen@5pointslaw.com

**PLAINTIFF REQUESTS TRIAL BY STRUCK JURY**

_____
OF COUNSEL

**DEFENDANT'S ADDRESS:**
Max Credit Union
c/o Any Officer
400 Eastdale Circle
Montgomery, AL 36117